No. 50,655

STATE OF KANSAS, *ex rel.,* CURT T. SCHNEIDER, Attorney General, *Appellee,* v. THE CITY OF TOPEKA, KANSAS, A Municipal Corporation, *Appellant.*

(605 P.2d 556)

Opinion filed January 19, 1980.

*Leon B. Graves,* assistant city attorney, argued the cause, and *Dan E. Turner,* city attorney, and *Amy L. Girst,* of Schroeder, Heeney, Groff, and Hiebert, of Topeka, were with him on the briefs for the appellant.

*Robert M. Fillmore,* assistant attorney general, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the briefs for the appellee.

*Jack S. McInteer,* of Curfman, Brainerd, Harris, Bell, Weigand, and Depew, of Wichita, argued and *Van R. Delhotal,* of Wichita, was with him on the brief *amicus curiae* for the Wichita Area Chamber of Commerce.

*Frank A. Bien,* of Topeka, was on the brief *amicus curiae* for the League of Kansas Municipalities.

The opinion of the court was delivered by

PRAGER, J.: This case involves the constitutionality of tax increment financing of programs designed to redevelop blighted business areas in Kansas cities as authorized by K.S.A. 1977 Supp. 12-1770 *et seq.* There is no factual dispute. The city of Topeka, by resolution No. 3241, adopted a redevelopment plan for a two-block downtown commercial area. At the same time, the city declared its intent to issue special obligation bonds in the amount of $18,000,000 to finance the redevelopment.

The urban redevelopment act, K.S.A. 1977 Supp. 12-1770 *et seq.,* was enacted by the 1976 legislature. It authorized cities to undertake redevelopment projects in "downtown commercial" areas and to finance such projects through the issuance of special obligation bonds. These bonds are to be repaid from increments in ad valorem property taxes resulting from the redevelopment projects. The act defines "increment" as that amount of ad valorem taxes collected from real property taxes, levied each year within the redevelopment project area, in excess of that amount which is produced from the assessed valuation of such property as of the date the redevelopment plan was adopted (12-1771[*e*]).

The act further provides that, with the first payment of taxes levied following the date of approval of any redevelopment plan by ordinance, real property taxes received by the county treasurer resulting from taxes levied by and for the benefit of a taxing subdivision on property located within such redevelopment area should be divided and allocated to two separate funds. First, the county treasurer is directed to allocate for general tax purposes all real property taxes collected from that portion of the assessed valuation of real property in the redevelopment area which does not exceed that shown on the assessment roll last equalized prior to the effective date of the ordinance. Second, the county treasurer is directed to allocate any real property taxes produced from that portion of the assessed valuation of real property within the redevelopment project area, in excess of that shown on the assessment roll last equalized prior to the effective date of the ordinance, to a special fund of the city to pay the principal and interest on any special obligation bonds issued by the city for the

redevelopment project (K.S.A. 1977 Supp. 12-1775[c]). For the purposes of the act, "taxing subdivisions" include only the county, the city, and a unified school district, the territory or jurisdiction of which includes the redevelopment area (K.S.A. 1977 Supp. 12-1775[a]).

Under K.S.A. 1977 Supp. 12-1775(b), all tangible taxable property located within a redevelopment project area must be assessed and taxed for ad valorem tax purposes in the same manner that such property would be assessed and taxed if located outside that area. Furthermore, all ad valorem taxes levied on redevelopment property must be paid to and collected by the county treasurer in the same manner as other taxes are paid and collected. It is only the *distribution* of the taxes collected which has been changed under the statutory scheme. Section 12-1776(c) requires the county assessor of any county in which a redevelopment project is authorized to certify the amount of such increase in assessed valuation of real and personal property within the redevelopment area to the county clerk on or before July first of each year. Thus, as specific property in the redevelopment area is improved, any increase in the assessed valuation of that property is reflected in the yearly certification filed by the county assessor. It is apparent that, under the statutory scheme, the payment of the special obligation bonds, issued by the city, are financed through the increase in ad valorem taxes resulting from the increase in assessed valuation of specific properties brought about by new construction in the redevelopment area; hence, we have tax increment financing.

Following the adoption of the resolution for a redevelopment project by the city of Topeka, but prior to the issuance of bonds, the State, through the attorney general, brought this action in quo warranto to oust the city from the exercise of any powers conferred on it by the redevelopment act. The State challenged the redevelopment act on the following constitutional grounds:

1. The act violates Article 11, Section 5, of the Kansas Constitution which requires a tax levy statute to state the object of the tax and requires the tax proceeds to be applied only to that specified object.
2. The act violates Article 11, Section 1, of the Kansas Constitution because the allocation of a portion of the real property taxes assessed in a redevelopment area to repay

the special obligation bonds violates the uniform and equal taxation provisions of that section.

3. The act confers an unconstitutionally broad delegation of power to the city by allowing its governing body to designate a "downtown commercial" area without standards or guidelines.

The district court held the redevelopment act to be unconstitutional under Article 11, Section 5, because the object of that portion of the taxes collected to be used for redevelopment purposes was not specified in each tax levy statute and the result was an improper diversion of tax proceeds for an object not authorized by the levy statute. Having found the redevelopment act unconstitutional for this reason, the district court declined to reach the second and third grounds of unconstitutionality asserted by the attorney general. The city promptly appealed to this court raising the same three issues asserted by the attorney general in the district court. These issues were briefed by the parties, and *amicus curiae* briefs were filed.

During the pendency of the appeal, the legislature enacted Chapter 52 of the 1979 Session Laws, which amended K.S.A. 1977 Supp. 12-1770 *et seq.,* and 190 separate tax levy statutes. Both parties have requested consideration of the 1979 amendments by this court in its determination of the constitutionality of tax increment financing. The sections of the redevelopment act, as amended in 1979, may be found in K.S.A. 1979 Supp. 12-1770 through 12-1776. 12-1777 through 12-1780 were not amended in 1979 and are not involved on this appeal.

It is obvious that the 1979 amendments were enacted by the legislature to remedy the constitutional defects suggested by the attorney general in district court in this case. For example, the attorney general objected to the term "downtown commercial" areas as an unlawful delegation of legislative authority, because a city governing body was given the power to designate an area as a "downtown commercial" area with no legislative standards or guidelines to control its discretion. The amendments changed the statutory terminology by substituting the term "central business district" for "downtown commercial" areas. Both the city and the attorney general now agree that the term "central business district" has a definite and specific meaning under urban redevelopment law which avoids any claim of unlawful delegation of legislative authority to a city.

The 1979 legislature, in Chapter 52, Laws of 1979, attempted to cure any Article 11, Section 5, violation by amending 190 different tax levy statutes to provide in each statute an additional object of the levy in the following language:

"[A]nd to pay a portion of the principal and interest on bonds issued under the authority of K.S.A. 1978 Supp. 12-1774, and amendments thereto, by cities located in the county."

The State contends that tax increment financing remains unlawful notwithstanding the 1979 legislative efforts to remedy any constitutional defects. The issues submitted for determination on the appeal are as follows:

1. Whether it is proper for the Supreme Court to consider the 1979 amendments to the redevelopment act in deciding the constitutional issues raised by the attorney general;
2. Whether K.S.A. 1979 Supp. 12-1770 *et seq.* violates Article 11, Section 5, of the Kansas Constitution;
3. Whether K.S.A. 1979 Supp. 12-1770 *et seq.* violates the uniform and equal provisions of Article 11, Section 1, of the Kansas Constitution; and
4. Whether the power given to a city governing body to define a "central business district" constitutes an unlawful delegation of legislative power to the city.

We will proceed to consider each of these points separately.

I. In determining the appeal, should the Supreme Court consider the 1979 amendments to K.S.A. 1977 Supp. 12-1770 *et seq.* and to 190 tax levy statutes in determining the constitutionality of tax increment financing?

Both parties urge us to consider the 1979 amendments. They maintain that the basic constitutional issues exist despite the amendments and public interest requires resolution of these issues now rather than requiring further proceedings in the district court. We agree. The situation is similar to that in *Manzanares v. Bell,* 214 Kan. 589, 595, 522 P.2d 1291 (1974), where we considered amendments to the Kansas No-Fault Insurance Act passed by the legislature after the case was determined in district court and appealed to this court. As in *Manzanares,* for us to decline to consider the 1979 amendments would result in another action immediately being filed in the district court with another appeal taken to this court at some future date. We should consider

the 1979 amendments because of the great public interest involved and to avoid future litigation. We took a similar position in *Dairy Belle, Inc. v. Freeland,* 175 Kan. 344, 264 P.2d 894 (1953), and *Ash v. Gibson,* 145 Kan. 825, 67 P.2d 1101 (1937). Accordingly, the 1979 amendments will be considered in determining the issues raised on this appeal.

II.   Does K.S.A. 1979 Supp. 12-1770 *et seq.* violate Article 11, Section 5, of the Kansas Constitution?

The State contended in district court, and the court agreed, that K.S.A. 1977 Supp. 12-1770 *et seq.* violates Article 11, Section 5, of the Kansas Constitution which provides as follows:

"§ 5.   Object of tax. No tax shall be levied except in pursuance of a law, which shall distinctly state the object of the same; to which object only such tax shall be applied."

It has been held that the purpose of this constitutional provision is "to prevent the levy of a tax for one purpose and the use of the funds raised thereby for another purpose." *State v. Butler County,* 77 Kan. 527, 536, 94 Pac. 1004 (1908). The failure to state the object of the tax in a levy statute has been considered fatal. *A.T. & S.F. Rld. Co. v. Woodcock, Treasurer,* 18 Kan. 20 (1877); *State, ex rel., v. Leavenworth County,* 2 Kan. * 61 (1863). Likewise, the diversion of funds to a purpose other than that stated in the levy statute is prohibited by Article 11, Section 5. *State, ex rel., v. Saline County Comm'rs,* 128 Kan. 437, 440, 278 Pac. 54 (1929); *State v. Butler County,* 77 Kan. at 536; *Smith v. Haney,* 73 Kan. 506, 509, 85 Pac. 550 (1906).

As noted above, K.S.A. 1977 Supp. 12-1774 authorized any city to issue special obligation bonds to finance a downtown redevelopment project. Section 12-1775 required any property tax, in excess of that assessed against the property immediately prior to the passage of the ordinance to redevelop the property, to be placed in a special fund of the city to pay the principal and interest on the bonds, as authorized by 12-1774. The redevelopment act, as originally enacted in 1976, did not attempt to amend *specific tax levy statutes* to include therein, as an additional object, a contribution toward repayment of the special obligation bonds issued by a city to finance a redevelopment project. At the time the redevelopment act was being considered by the legislature in 1976, the then attorney general took the position that such an amendment to all applicable tax levy statutes was necessary in

order to meet the requirement of Article 11, Section 5. The legislature declined to follow the suggestions of the attorney general and enacted the redevelopment act without amending individually all applicable tax levy statutes. This failure on the part of the 1976 legislature resulted in the filing of the lawsuit which is now before us.

The district court, in declaring the redevelopment act unconstitutional as in violation of Article 11, Section 5, relied primarily upon *National Bank v. Barber,* 24 Kan. *534 (1880), which presented a factual situation quite similar to that in this case. In *Barber,* the statute in question authorized any county or township tax, assessed against railroad property within a township, to be set aside from the general fund and applied to payment of the principal and interest on railroad bonds issued by the township. The statute was a general law, and the legislature made no attempt to amend specific tax levy statutes to provide for the payment of such bonds as an object of the tax. The statute considered by the court in *Barber* was held to be unconstitutional as an improper diversion of tax funds in violation of Article 11, Section 5, of the Kansas Constitution. We are convinced that *Barber* is directly in point and that the learned trial court was correct in holding the 1976 redevelopment act, K.S.A. 1977 Supp. 12-1770 *et seq.* unconstitutional as a violation of Article 11, Section 5, of the Kansas Constitution. On this appeal, however, we are to consider the effect of the 1979 amendments to determine whether or not the constitutional infirmities have been corrected.

As noted earlier, the 1979 legislature sought to cure the constitutional infirmity by amending 190 tax levy statutes to include, as a stated object in each, a contribution toward the repayment of special obligation bonds issued by a city to finance a redevelopment project. The State contends that the specific amendment of 190 tax levy statutes failed to cure the Article 11, Section 5, defect because the legislature failed to amend at least ten tax levy statutes which might be applicable to a certain city under certain circumstances. It is clear to us that, in light of the large number of statutes that were in fact amended, the failure of the legislature to amend ten tax levy statutes can only be attributed to oversight, and not to any attempt to circumvent the constitutional requirements of Article 11, Section 5. We have concluded that if a tax levy statute was overlooked and not amended by the legislature in

1979, the effect is to eliminate the tax increment contribution from tax funds raised under that statute only and it does not affect the constitutional validity of other tax statutes which were properly amended. Any tax levy statute which was inadvertently overlooked by the legislature may be subsequently amended and, after such an amendment becomes effective, tax funds raised thereunder may be allocated toward the payment of special obligation bonds established to finance a particular redevelopment project.

The State in its brief further maintains that the requirements of Article 11, Section 5, are not satisfied because the language of that section precludes more than one object in a particular tax levy statute and, furthermore, that, assuming dual objects are constitutionally permissible, the tax revenues attributable to the increment in value of a redeveloped central business district are unlawfully diverted when allocated to only one of two co-objects of taxation. We find these contentions to be without merit. K.S.A. 1979 Supp. 12-1771(e) requires the increment in ad valorem property taxes resulting from a redevelopment project be placed in a special fund for repayment of the special obligation bonds. 12-1774 provides that special obligation bonds are to be repaid in part from property tax increases as the property is redeveloped. Finally K.S.A. 1979 Supp. 12-1775(c) sets forth, in clear and specific language, a formula for the division of real property taxes collected between the special fund of the city to finance the redevelopment project and the general fund used for the payment of the ordinary and usual activities of the taxing subdivision. It is not probable that taxing officials would wrongfully apportion taxes to the special fund in excess of what has been prescribed by the statutory formula. There is no language in Article 11, Section 5, which precludes a tax levy statute from having more than one object, so long as the legislature establishes a formula for the allocation of tax funds to each of the objects described in the tax levy statute. After a careful consideration of the 1979 amendments to the redevelopment act, we have concluded that the act in its present form is not unconstitutional as a violation of Article 11, Section 5, of the Kansas Constitution.

III.   Does K.S.A. 1979 Supp. 12-1770 *et seq.* violate the uniform and equal provisions of Article 11, Section 1, of the Kansas Constitution?

Article 11, Section 1, of the Kansas Constitution provides in part as follows:

"The legislature shall provide for a uniform and equal rate of assessment and taxation . . . . All property used exclusively for state, county, municipal . . . purposes, . . . shall be exempted from property taxation." (1977 Supp.)

The redevelopment act clearly requires any property within a redevelopment area to be assessed and taxed in the same manner as if located outside the area (K.S.A. 1979 Supp. 12-1775[b]). Section 12-1776(c) requires the county assessor to certify annually any increase in assessed valuation of real property within the redevelopment area on or before July first of each year. Thus the assessed valuation is kept current each year. The amount of assessment in excess of the last assessment prior to the adoption of the city ordinance authorizing redevelopment is to be deposited into the special city fund to pay the principal and interest on the bonds established to pay for the redevelopment project (12-1771[e]; 12-1775[c]).

The State contends that the above statutory provisions violate the uniform and equal provisions of Article 11, Section 1, because property not in the redevelopment district bears a proportionately higher burden than does property located within the redevelopment district. The city of Topeka maintains that there is no "uniform and equal" violation under the Kansas tax increment legislation because redeveloped property *is assessed and taxed at the same rate as similar property outside the redevelopment area.* It is clear that, under the statutes discussed above, redevelopment property is *assessed or valued* in exactly the same manner as similar property outside the redevelopment area. Likewise, the tax rate is identical. Thus under K.S.A. 1979 Supp. 12-1770 *et seq.* there is uniformity in both the *valuation* and the *rate* of taxation.

The only possible nonuniformity or inequality would result from the statutory allocation or distribution of the tax money already collected. Article 11, Section 1, does not require uniformity and equality in the distribution of tax money. That constitutional provision only requires the legislature to provide for a uniform and equal *rate* of assessment and taxation. See *Comm'rs of Ottawa Co. v. Nelson,* 19 Kan. 234, 237 (1877). This court has consistently limited the scope of the equality and uniformity requirement to the *levy and assessment* of taxation of

property. That constitutional provision has not been made applicable to the *distribution or allocation* of taxes after they are collected. *Kansas City S. Rly. Co. v. Cherokee County Comm'rs,* 138 Kan. 534, 537, 27 P.2d 220 (1933); *Freedom Township v. Douglas,* 99 Kan. 176, 179, 160 Pac. 1147 (1916); *Wheeler v. Weightman,* 96 Kan. 50, 149 Pac. 977 (1915); *Sumner County v. Wellington,* 66 Kan. 590, 593, 72 Pac. 216 (1903); *In re Page,* 60 Kan. 842, 846, 58 Pac. 478 (1899); *Elevator Co. v. Stewart,* 50 Kan. 378, 383, 32 Pac. 33 (1893); *Beebe v. Wells,* 37 Kan. 472, 475, 15 Pac. 565 (1887); *Hines and others v. The City of Leavenworth and others,* 3 Kan. 186 (1865).

The general rule governing the application of "uniform and equal" provisions in various state constitutions is stated as follows in 84 C.J.S., Taxation § 34, p. 111:

"Constitutional provisions requiring equality and uniformity do not relate to the distribution or application of the revenue derived from taxation, and hence statutes relative to such matters cannot be held invalid as violative of those requirements."

In support of the general rule, cases are cited holding that no uniform and equal violations arise from the unequal distribution of collected taxes. See for example *Griffin v. Anne Arundel County,* 25 Md. App. 115, 128, 333 A.2d 612 (1975); *Manchester Sav. & Loan Ass'n v. State Tax Commission,* 105 N.H. 17, 21, 191 A.2d 529 (1963); *Culley v. Pearl River Industrial Comm.,* 234 Miss. 788, 108 So. 2d 390 (1959).

In *Dean v. Coddington, et al.,* 81 S.D. 140, 143, 131 N.W.2d 700 (1964), it was held that the unequal distribution of ad valorem property taxes collected to support public schools did not violate the uniform and equal requirements when one school district received school funds, and another school district, which supported no public schools, did not. The South Dakota court held the constitutional requirements of uniform and equal taxation were analogous to the equal protection requirements of the Fourteenth Amendment to the United States Constitution. Neither were violated by an unequal *distribution* of taxes. To the same effect is *Hess v. Mullaney,* 213 F.2d 635, 15 Alaska 40 (9th Cir.), *cert. denied* 348 U.S. 836 (1954), which holds that no requirements of uniformity or equal protection of the law limit the power of a legislature in respect to allocation and distribution of public funds.

The State relies in support of its position on *Gottlieb v. Milwaukee,* 33 Wis. 2d 408, 147 N.W.2d 633 (1967). That case held unconstitutional, for lack of uniformity, an urban redevelopment statute which allowed redevelopment property a partial exemption from local property taxes for a period not exceeding 30 years in exchange for redevelopment of the property in accordance with the city's plan. The basis for the holding in *Gottlieb* was that the "freeze" on the assessment was in fact a partial exemption from taxation, prohibited by the uniform and equal requirements of the Wisconsin Constitution. It is clear that the Wisconsin statute involved in *Gottlieb* is not comparable to the Kansas statute now under consideration. Under the Kansas redevelopment act, redevelopment property is assessed and taxed on an equal basis with similar property not located within the redevelopment area. The redevelopment property itself receives no tax break or exemption. Hence, the present case is distinguishable from *Gottlieb.*

We have concluded that K.S.A. 1979 Supp. 12-1770 *et seq.* does not violate the uniform and equal requirements of Article 11, Section 1, of the Kansas Constitution. When the rate of property assessment is uniform throughout a taxing district, the constitutional mandate of uniform and equal taxation has been fulfilled. The distribution of taxes, once collected, is a matter of legislative discretion so long as it is distributed for a valid public purpose.

IV. Does K.S.A. 1979 Supp. 12-1770 *et seq.,* which grants to the governing body of a city the authority to determine and describe the boundaries of the central business district of the city to be included within a redevelopment plan, constitute an unlawful delegation of legislative power?

As noted above, all parties now take the position that the 1979 amendments cured any defects in this regard. We agree with the parties. The 1979 Kansas legislature amended K.S.A. 1977 Supp. 12-1770 through 12-1774 by substituting at various places the term "central business district" for the term "downtown commercial" areas. We hold that the term "central business district" provides to the governing bodies of Kansas cities an adequate standard by which their actions may be reviewed while allowing them to take into account the diverse character and geographies of their individual cities. The term "central business district" is one commonly used by federal agencies in the administration of

urban redevelopment and other programs. See 23 U.S.C. § 137 (a); F. Stuart Chapin, and Edward J. Kaiser, Urban Land Use Planning, Chapter 8 at pp. 231-288 (3rd ed. 1979). The term "central business district" is a generally recognized standard by which the actions of local governing bodies may be reviewed in light of the geographic diversity of Kansas communities. We find no unlawful delegation of legislative power.

For the reasons set forth above, we have concluded that the district court correctly determined the original redevelopment statute, K.S.A. 1977 Supp. 12-1770 *et seq.,* to be unconstitutional as violating Article 11, Section 5, of the Kansas Constitution. We hold, however, that the 1979 amendments now found at K.S.A. 1979 Supp. 12-1770 *et seq.,* together with the amendment of 190 special tax levy statutes corrected that constitutional defect. We further hold that the redevelopment act as amended is not unconstitutional on any other grounds asserted by the attorney general in this case.

It follows that the judgment of the district court is reversed. Judgment is entered in favor of the defendant city denying the State's petition for a writ of quo warranto and upholding the constitutionality of K.S.A. 1979 Supp. 12-1770 *et seq.* in accordance with the views expressed in this opinion.

It Is So Ordered.